J-A07038-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.L.R.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: R.L.R., MOTHER | : | |
| | : | |
| | : | No. 1552 MDA 2023 |

Appeal from the Decree Entered October 12, 2023
In the Court of Common Pleas of York County Orphans' Court at No(s):
2023-0120a

BEFORE: STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:     **FILED: MAY 6, 2024**

R.L.R. ("Mother"), appeals from the October 12, 2023, decree granting the petition of York County Offices of Children, Youth and Families ("the Agency") and involuntarily terminating her parental rights to her daughter, A.L.R.H. ("Child"), born in June 2006, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  After review, we affirm.

We glean the following factual and procedural history of this case from the certified record.

---

[*] Former Justice specially assigned to the Superior Court.

[1] By separate decree dated and entered September 25, 2023, the orphans' court involuntarily terminated the parental rights of Child's father, D.L.H. ("Father").  Father did not file an appeal or participate in the instant appeal. Father's whereabouts had been unknown to the Agency since the time of adjudication.  Notes of Testimony ("N.T."), 9/25/23, at 26.

. . .

6.  An Application for Emergency Protective Custody was filed by the Agency on December 7, 2020.  . . . [I]t was alleged that the Agency has received numerous referrals regarding [C]hild and family.[2]  On or about November 24, 2020, the Agency received a referral regarding [C]hild] due to allegations of environmental concerns.  The home [in which] the family was residing was condemned.  The family was believed to be residing in [a] Red Roof Inn but they often move from place to place.  Mother routinely permits indicated perpetrators of abuse to come in and out of the home and interact with [C]hild unsupervised.  [] Father is indicated for sexual abuse; there are concerns and allegations that [C]hild has been [a] victim of sexual abuse by [] Father.  [C]hild gave birth to a son on December 3, 2020.  There is concern that Mother allowed a 24 year old man to have a sexual relationship with [C]hild who was 14 years of age and that [Child]'s son is the result of this relationship.  [C]hild reports that she has not attended school in the 2020/2021 school year.  There are concerns regarding [] Mother's ability to care for [C]hild due to the unstable housing and environment.  The Agency has concerns regarding the safety and wellbeing of [C]hild should she remain in the parents' custody.  . . .

7.  In an Order for Emergency Protective Custody dated December 7, 2020, sufficient evidence was presented to prove that continuation or return of [C]hild to the home of Mother and Father was not in the best interest of [C]hild.  Legal and physical custody of [C]hild was transferred to the Agency.  . . .

. . .

---

[2] The record reveals that Child is the youngest of seven children born to Mother.  **See** CYS Exhibit 7 (parenting capacity assessment) at 1 (unpaginated).  Mother's older children are not subjects of the underlying proceedings or the instant appeal.

Stipulation of Counsel, 9/15/23, at ¶¶ 6, 7.  Child was placed, along with her infant child, and has remained in care since.[3]

The court adjudicated Child dependent on January 27, 2021, and established a permanency goal of return to parent or guardian.  ***See id.*** at ¶ 10; ***see also*** N.T., 9/25/23, at 23.  In furtherance of reunification, the Agency instituted family service plans which were forwarded to Mother, the goals of which remained consistent throughout the dependency proceedings.[4]  ***See id.*** at ¶ 13; ***see also*** Agency Exhibits 1 through 5 (family service plans); N.T., 9/25/23, at 20-22, 47-48.  Mother failed to raise any objection or take exception to any of her family service plan goals.  ***See*** N.T., 9/25/23, at 22-23.  Her primary goals were to maintain Child's safety, cooperate with provider services, and address Child's truancy.  ***See id.*** at 24.

Throughout the ensuing dependency proceedings, the court conducted regular review hearings at which it maintained Child's commitment and placement.  The court consistently characterized Mother's compliance with the permanency plan and progress towards alleviating the circumstances which

---

[3] At the time of the subject proceedings, Child, then over seventeen years old, and her minor child, then over two and half years old, had been placed in their current pre-adoptive, kinship care home for over a year.  ***See*** Order Modifying Placement, 7/28/22; N.T., 9/25/23, at 31.

[4] We note that the Agency had previously been involved with this family and, as such, the initial family service plan dates back to August 2018.  ***See*** CYS Exhibit 1 (family service plan); ***see also*** N.T., 9/25/23, at 20-21.

necessitated placement as moderate. **See** Stipulation of Counsel, 9/15/23, at ¶¶ 14-18.

Ultimately, on May 18, 2023, the court changed Child's permanency goal to adoption with a concurrent goal of permanent legal custody (non-relative). **See id.** at ¶¶ 18, 19; **see also** N.T., 9/25/23, at 23.

On July 11, 2023, the Agency filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511 (a)(1), (2), (5), (8), and (b). The orphans' court held an evidentiary hearing on September 25, 2023. At the time, Child, then seventeen years old, was represented by a separate guardian *ad litem* ("GAL") and legal counsel.[5] **See** 23 Pa.C.S.A. § 2313(a). Mother, who was represented by counsel, was not present. Upon request of the Agency, the orphans'' court incorporated the dependency record and granted judicial notice of all applications, petitions, motions, and orders as docketed with the Clerk of Courts in the dependency action.[6] **See** N.T., 9/25/23, at 5-6. The Agency presented the testimony of Pressley Ridge parent educator, Regina Fike; and Agency caseworker, Family

---

[5] Both the GAL and legal counsel argued in favor of termination at the conclusion of the September 25th hearing. **See** N.T., 9/25/23, at 56-57. The GAL likewise submitted a letter in lieu of brief to this Court in support of termination. **See** Letter, 1/23/24.

[6] A stipulation of counsel had additionally been filed on September 15, 2023. **See** Stipulation of Counsel, 9/15/23.

Preservation Unit, Aubree Dedrick.[7]  The Agency additionally proffered exhibits which were admitted without objection.  **See id.** at 5.  By decree dated and entered September 25, 2023, the court involuntarily terminated Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[8]

Subsequent to the filing of a timely petition, pursuant to order of October 4, 2023, the orphans' court vacated the termination decree as to Mother and reopened the record to allow for additional testimony, including that of Mother.[9]  The court convened a continued hearing on October 12, 2023, wherein Mother testified on her own behalf.  On the same date, the court entered its decree involuntarily terminating Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[10]

Thereafter, on November 13, 2023, Mother filed a timely notice of appeal, along with a concise statement of errors complained of on appeal

---

[7] Ms. Dedrick testified that she had been the assigned caseworker for approximately one year and two months.  N.T., 9/25/23, at 20.

[8] Pursuant to order of the same date, the court memorialized its reasoning as placed on the record at the conclusion of the hearing.  **See** Order, 9/25/23.

[9] The court found that Mother failed to appear at the September 25th hearing for credible reasons.  **See** N.T., 10/12/23 at 21; **see also id.** at 24.

[10] Pursuant to order of the same date, the court memorialized its reasoning as placed on the record at the conclusion of the hearing.  **See** Order, 10/12/23.

pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[11] The orphans' court filed a Rule 1925(a) opinion on November 27, 2023, which referenced and incorporated its reasoning placed on the record on September 25, 2023, and October 12, 2023.

On appeal, Mother raises the following issue for our review, "Did the [orphans' court] abuse its discretion and err as a matter of law in finding that the Agency met its burden to terminate Mother's parental rights under 23 Pa.C.S.A. Section 2511(a)(1), (2), (5), (8) and 2511(b)?" Mother's Brief at 5.

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the

_____

[11] We note that Mother's time in which to file a timely appeal with respect to the orphans' court's decrees technically fell on November 11, 2023. *See* Pa.R.A.P. 903(a). Since that day was a Saturday, however, Mother's time in which to appeal was extended until Monday, November 13, 2023, by operation of statute. *See* Pa.R.J.A. 107(a)-(b) (relating to the computation of time and setting forth a rule of construction that excludes the last day of any period that falls upon a Saturday, Sunday, or legal holiday); Pa.R.A.P. 107 (incorporating by reference the rules of construction set forth in the Pennsylvania Rules of Judicial Administration with respect to the Pennsylvania Rules of Appellate Procedure); *see also* Pa.R.A.P. 903, cmt.

facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed at statute by Section 2511 of the Adoption Act, which requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under one of the eleven enumerated grounds set forth at Section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which focuses upon the child's needs and welfare. *See In re T.S.M.*, 602 Pa. 602, 628, 71 A.3d 251, 267 (2013). To involuntarily terminate parental rights, the petitioner must satisfy both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue." ***In re Adoption of C.M.***, 255 A.3d 343, 359 (Pa. 2021).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).  To affirm the underlying decrees, however, we need only agree with the court's decision as to any one subsection of Section 2511(a), along with Section 2511(b).  ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  As such, we limit our discussion to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of subsection (a)(2), the party petitioning for termination must establish: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot and will not be remedied. ***See In re Adoption of A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021). Subsection (a)(2) emphasizes the child's present and future needs, not the parent's refusal to perform their duties and thus "should not be read to compel courts to ignore a child's need for a stable home and strong continuous parental ties. . . . **This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it**." ***In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted) (emphasis in original). Section 2511(a)(2) grounds are not limited to affirmative misconduct; they may also include acts of refusal and incapacity to perform parental duties. ***See In re S.C.***, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by* ***Interest of K.T.***, 296 A.3d 1085, 1110 n.23 (Pa. 2023). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ***See In re M.A.B.***, 166 A.3d 434, 443 (Pa. Super. 2017).

With respect to the orphans' court's findings of incapacity pursuant to subsection (a)(2), Mother argues that she

is able to provide essential parental care for [C]hild now. Mother is able to provide a stable home for [C]hild. Again, this is not saying that Mother does not have certain limitations; however, they do not warrant termination of parental rights and therefore the Lower Court erred as a matter of law.

Mother's Brief at 20. We disagree.

Contrary to Mother's arguments, the record supports the orphans' court's finding of an ongoing lack of parental capacity which persisted and was denied by Mother. The orphans' court stated:

The court would note that the record establishes that [Mother], while engaged in some services during the course of adjudication of dependency of her daughter, never progressed to the point to which she was able to adequately address the very real concerns regarding her protective capacity as it relates to [Child], as well as advance and demonstrate appropriate understanding and implementation of proper parenting. The testimony established that [Mother] did not believe she needed additional parenting, training, or assistance. . . .

N.T., 10/12/23, at 29; *see also* N.T., 9/25/23 at 65-66 (noting, in part, "[M]other's overall protective capacity and ability to properly parent [Child] remains a very significant concern for the [c]ourt."). We agree.

Jonathan Gransee, Psy.D., licensed psychologist, conducted a parenting capacity assessment of Mother dated May 5, 2021, which was admitted without objection as CYS Exhibit 7. *See* N.T., 9/25/23, at 4-5. Dr. Gransee expressed "serious concerns regarding [Mother's] ability to ensure the safety of her children." CYS Exhibit 7 (parenting capacity evaluation), at 9 ¶ 2 (unpaginated). Following testing, including testing related to Mother's IQ, he

found that Mother suffered from intellectual disability. ***See id.*** at 7. He explained that, not only would this result in academic difficulty, but

> individuals with this level of intelligence often have issues with regards to judgment, and they tend to make mistakes in thinking, because of their limited cognitive abilities. They may also try to disguise their limited cognitive abilities, which can make it seem as if they are being non-compliant, rather than that they simply do not understand.

***Id.*** Dr. Gransee therefore concluded, "At this point it does not appear that she is capable of safely parenting her child, and it is not clear that that will change." ***Id.*** at 10. As such, he recommended, *inter alia*, "ongoing parenting support in terms of learning additional parenting skills." ***Id.***

While Mother engaged in parent education with Child through Pressley Ridge, Ms. Fike, the Pressley Ridge parent educator, testified that Mother was "noncompliant and continued to be resistant to the idea that she could benefit from parent education services." N.T., 9/25/23, at 12. She continued,

> Mother was very resistant is perhaps the better way to discuss this. Mother was -- we were doing the visits concurrently with parent education. So[,] a parent education session would occur and then the visit. Mother frequently would be late or would not – say that she couldn't stay after the visit. Mother was also very vocal about telling me that she felt this was an inappropriate request that was being made of her and she was generally not supportive of it.

***Id.*** at 12-13. Ms. Fike acknowledged that Mother had cognitive limitations but "never felt that [she] didn't understand . . . . She understood the concepts that were being presented to the extent that she could relay them back to me. She did not ever reach a threshold where she felt that any of those things

applied to her." *Id.* at 13. Parent education services were therefore closed without Mother completing the program successfully. *See id.* at 16; *see also* CYS Exhibit 6 (Pressley Ridge closing summary).

Similarly, Ms. Dedrick confirmed that Mother had not successfully engaged in parent education services. *Id.* at 33. She further testified, "It's my impression that [Mother] believes she doesn't need parent[] education. She, in the time that I've been assigned the case, has never expressed the desire for any services from the agency besides visitation. . . ." *Id.* at 38. As a result, Ms. Dedrick opined that Mother was not prepared to care for and meet the needs of Child due to her cognitive limitations and denial of parent education. *Id.* at 37-38. Ms. Dedrick expressed concern about Mother's ability to meet her own needs, as well as Child's, and concern for Mother's ability to care for Child and Child's child. *See id.* at 33, 40, 42. Specifically, as to visitation, Ms. Dedrick noted Mother's inability to parent and correct Child and her inability to manage Child without supervision. *See id.* at 42. In addition, she noted Mother's failure to comprehend the circumstances surrounding Child's conception of her child. She stated, "[Mother]'s in denial of the circumstances." *Id.* at 43.

Based on the foregoing, we discern no abuse of discretion by the court in concluding the evidence warranted termination pursuant to Section 2511(a)(2). The record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect or refusal has caused Child to be

without essential parental care, control or subsistence necessary for her physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the Mother. *See A.H.*, 247 A.3d at 443. After over two and a half years, Mother had yet to remedy her continuing diminished protective capacity and rejected efforts at parent education. As the court stated:

> It was more than two years ago when Dr. Gransee identified that [Mother] was not capable of safely parenting [Child]. Mother has had more than two years to address the concerns raised by Dr. Gransee's evaluation. The [c]ourt finds that [M]other has failed to in any way be proactive in addressing Dr. Gransee's concerns and demonstrate that she is able to safely parent [Child].

N.T., 9/25/23, at 70. Significantly, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Having found sufficient grounds for termination pursuant to Section 2511(a)(2), we next must determine whether termination was proper under Section 2511(b), which affords "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). "[T]he determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention' should be paid to discerning the effect on the child of permanently severing the parental bond." *See T.S.M.*, 620 Pa. at 628, 71

A.3d at 267 (internal citations omitted).    As our Supreme Court recently explained in **Interest of K.T.**, 296 A.3d 1085, 1113 (Pa. 2023):

> [A] court conducting a Section 2511(b) analysis **must consider more than proof of an adverse or detrimental impact** from severance of the parental bond.  We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

**K.T., supra** (emphasis added).

The evaluation of a child's respective bonds is not always an easy task. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.  The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case."  **In re K.Z.S.**, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

In addition, the **K.T.** Court held that the "Section 2511(b) inquiry must also include consideration of other important factors." **Id**.  While not inventing an exhaustive list of considerations, the Court explained that the inquiry **must consider and weigh** certain evidence **if it is present in the record**, including, but not limited, "the child's need for permanency and the length of time in foster care [. . .]; whether the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of

love, comfort, security, safety, and stability." ***Id.*** (footnote omitted); ***see also id.*** at n.28 (emphasis in original).

As to Section 2511(b), Mother argues that termination does not serve Child's best interests, pointing to a mutually desired relationship between she and Child. Mother states:

> [T]ermination of Mother's parental rights does not serve the best needs of [C]hild. Throughout the case, it was stated that [C]hild wanted a relationship with [] Mother and Mother wanted a relationship with [C]hild. It is argued that terminating Mother's rights do not help [C]hild in anyway. With [C]hild's age, theoretically she could continue to live outside of Mother's home by agreement without terminating parental rights.

Mother's Brief 24-25. Mother further asserts that a Section 2511(b) analysis is not even warranted. "As stated previously in this brief, the [c]ourt does not even get to a [Section] 2511(b) analysis if sufficient grounds do not exist under Section 2511(a). It is argued that in this case, there is no reason to move to an analysis under [Section] 2511(b)." ***Id.*** at 25. We disagree.

As noted above, we conclude that the orphans' court did not abuse its discretion or legally err in concluding that sufficient grounds for termination existed pursuant to Section 2511(a). In determining that termination was additionally proper under Section 2511(b), the orphans' court found that Child does not share a parent-child bond with Mother, but instead shares such a bond with her kinship parents. The court stated as follows:

> As it relates to any bond between [Child] and [M]other, the [c]ourt finds that there is a bond, but it is not a parental bond. The [c]ourt finds that based on the testimony here today, and the [c]ourt's lengthy involvement with both [Child] and [M]other

- 15 -

throughout the course of adjudication of dependency, that [M]other has in essence a friend bond with [Child]. The [c]ourt finds that the strongest and, at this point, only parental bond with [Child], is between [Child] and her resource parents, who are identified a[s] pre-adoptive parents for [Child].

Testimony established that [Child] looks to her [kinship] parents as her parental figures. The [c]ourt notes in assessing the bond that exists between the parents and [Child], the court is to assess whether the bond that does exist is necessary and beneficial to the child in order for the child's developmental, physical, and emotional needs and welfare to be properly met. The [c]ourt finds that [Child]'s [kinship] parents are the ones who are providing a bond to [Child] that is allowing her to meet her developmental, physical, and emotional needs.

The [c]ourt finds by clear and convincing evidence that the bond that exists between [Mother] and [Child] is not necessary for [C]hild's developmental, physical, and emotional needs to be met, and, in fact, is not beneficial to her meeting those needs.

N.T., 10/12/23, at 68-69; *see also* N.T., 9/25/23, at 31 ("The [c]ourt reaffirms that there's a bond between Mother . . . and [Child]. However, that bond is not an appropriate parental bond but more of a friend bond. . . . [T]he termination of her parental rights . . . best serves the needs and welfare of [Child], and . . . will allow her to move forward and achieve permanency."). We discern no abuse of discretion.

Indeed, while Mother maintained visitation with Child, such visitation remained supervised and never progressed. *See* N.T., 9/25/23, at 11-12, 28. Ms. Fike expressed concerns for Child's emotional safety, describing the visits as traumatic. *See id.* at 12-14. She explained, "I spent a fair amount time with [C]hild. . . . She was noticeably different in the visits with [M]other. I felt that she was a bit more hypervigilant, a bit more aware, seemed very

- 16 -

concerned when mom would say things that might ring as inappropriate. She just seemed generally stressed in that environment. . . ." *Id.* at 14. Then, clarifying that the negativity emanated from the parent education sessions that were held in connection with visitation, Ms. Fike continued, "I can't say the visits themselves had a negative impact, but us doing parent education appeared to raise issues and subject matter that that caused some anxiety, I believe for [Child]. That was my impression." *Id.* at 17. Moreover, the court ceased phone contact between Mother and Child, and there was no indication of any contact via mail or social media. *See id.* at 29, 50. Thus, although Ms. Dedrick recognized a bond between Mother and Child, it was not a parental bond. *See id.* at 30, 38 ("I would not call it parental, but they do have a bond."). She labelled the relationship as "more of a friendship." *Id.* at 38.

Rather, Ms. Dedrick recognized that Child shares a parental bond with her kinship parents. *See id.* at 30-31. Ms. Dedrick testified:

> Q. [C]ould you comment upon what type of parental bond the minor child has with the [kinship] family?
>
> A. [Kinship] parents have stepped in to provide that parental relationship for [Child]. They correct her when needed. They guide her with parenting her own child. They give her that stability that a parent should give her.
>
> Q. Would you conclude that she views them as parental type figures?
>
> A. Yes.

*Id.* at 31. Her child likewise has a positive relationship with Child's kinship parents. He "calls [kinship parents] Meme and Popop. So he does view them

as grandparents figures. All interaction I've seen have been positive." *Id.* at 31.

Ms. Dedrick confirmed that Child is doing "exceedingly well" in the kinship home, which is pre-adoptive. *Id.* at 40-41. She indicated that Child has an IEP and is doing "exceptional" in school. *Id.* at 39. In fact, Ms. Dedrick observed, "All of her grades are fantastic." *Id.* She also reported that Child is involved in marching band. *See id.* at 40.

Ms. Fike stated that Child expressed a desire for permanency in her kinship home. She testified:

> Q. During your visits -- excuse me -- and work with [Child], did she express her views to you regarding her permanency?
>
> A. She did.
>
> Q. And what were those?
>
> A. Over the amount of time that I spent with her, she moved from a position of being very, very concerned that she not heard from [M]other to articulating a belief that it was not in her best interest or her son's best interest to return to [M]other, and from that point expressed a desire to have permanency in her current home.

*Id.* at 14-15. Likewise, Ms. Dedrick stated that Child indicated that she wants "to be adopted." *Id.* at 41-42. As such, Ms. Dedrick opined that termination was in Child's best interests. She explained, "Once termination of parental rights occurs, [Child] would be able to have permanency that she desires and deserves in [her kinship home]." *Id.* She further predicted no long-term negative impact as a result of termination. *Id.*

Hence, the record corroborates the orphans' court's determination that termination of Mother's parental rights best serves Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). As such, we do not disturb the orphans' court's determination.

As Mother has failed to show that the orphans' court abused its discretion in finding grounds for termination pursuant to Section 2511(a)(2) and that termination of her parental rights favors the Child's needs and welfare pursuant to Section 2511(b), she is due no relief. For the foregoing reasons, we affirm the termination decree.

Decree affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/6/2024